UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No.  08-CR-360 |
| Plaintiff, | : | |
| | : | JUDGE KATHLEEN O'MALLEY |
| v. | : | |
| LORENZO KEITH, | : | **MEMORANDUM AND ORDER** |
| Defendant. | : | |

Before the Court is Defendant Lorenzo Keith's Motion to Suppress Evidence.  (Doc. 47.)  In particular, Keith asks this Court to suppress illegal narcotics and unlawful firearms that were discovered during a search of a residence where Keith does not live, but where he does occasionally visit, as well as two vials of a substance known as "cut" that were discovered in a search of his person.  He also asks this Court to suppress certain unspecified statements that he made while in police custody.

An evidentiary hearing has been held in this matter (*see* Doc. 51) and the parties have submitted supplementary briefing (*see* Docs. 52; 53).  For reasons more fully explained below, Keith's motion must be **DENIED**.

### I. PROCEDURAL HISTORY

On August 28, 2008, a grand jury returned a two-count indictment against Keith.  The indictment charged Keith with possession of cocaine with the intent to distribute, as well as with the illegal possession of firearms and ammunition:

> On or about April 3, 2008, in the Northern District of Ohio, Eastern Division, the defendant, LORENZO M. KEITH, did knowingly and intentionally possess with the intent to distribute approximately 126.3 grams of a mixture or substance containing a detectable amount of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Sections 841 (a)(1) and (b)(1)(C).

> The Grand Jury further charges: On or about April 3, 2008, in the Northern District of Ohio, Eastern Division, LORENZO M. KEITH, having been previously convicted of crimes punishable by imprisonment for a term exceeding one year, that is, Robbery with a firearm specification, Case Number CR-01412713, in the Cuyahoga County Common Pleas Court, on or about April 14, 2002; and Trafficking in Drugs, Case Number CR06-485716, in the Cuyahoga County Common Pleas Court, on or about May 29, 2007, did knowingly possess in and affecting interstate commerce firearms, to-wit: Intratec 9mm Luger, serial number A040335, and a Taurus .40 caliber handgun PT940, serial number SOE75963, and ammunition, in violation of Title 18, Untied States Code, Section 922(g)(1).

(Doc. 1.) The referenced narcotics, firearms, and ammunition were seized during an April 3, 2008 search, which is the subject of the instant motion.

On September 12, 2008, Keith was arraigned before Magistrate Judge David S. Perelman. (Doc. 5.) The case then took a number of lengthy procedural turns not relevant to a resolution of this motion: Keith was appointed counsel, Keith fired that counsel, proceeded pro se for a time, filed numerous motions, hired new counsel with the help of his family, fired that counsel, and, finally, asked that new counsel be appointed for him, which occurred before the hearing on this motion.[1]

On October 7, 2009, the Government sought and a grand jury returned a five-count superseding indictment against Keith. (Doc. 39.) This indictment included the original two counts, but also added three additional charges – two for distribution of narcotics, and one for illegal possession of ammunition:

> On or about February 12, 2008, in the Northern District of Ohio, Eastern Division, the defendant, LORENZO M. KEITH, did knowingly and intentionally distribute approximately 60.2 grams of a mixture or substance containing a detectable amount of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Sections 841(a) (1) and (b) (1) (C).

---

[1] During that time, Keith's various counsel attempted to negotiate a plea agreement on Keith's behalf. On several occasions Keith indicated that he might accept the agreement offered by the Government, but in court he repeatedly declined the Government's offer: twice before this Court, and twice before Magistrate Judge Kenneth S. McHargh. Although Keith's various counsel, this Court, and Judge McHargh devoted considerable time to Keith to allow him to accept a plea if that was his wish, Keith was entirely within his rights to reject the Government's offer. (*Cf.* Doc. 34 (finding Keith competent to stand trial and represent himself).)

>The Grand Jury further charges: On or about March 14, 2008, in the Northern District of Ohio, Eastern Division, the defendant, LORENZO M. KEITH, did knowingly and intentionally distribute approximately 55.7 grams of a mixture or substance containing a detectable amount of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Sections 841(a) (1) and (b) (1) (C).
>
>The Grand Jury further charges: On or about September 12, 2008, in the Northern District of Ohio, Eastern Division, LORENZO M. KEITH, having been previously convicted of crimes punishable by imprisonment for a term exceeding one year, those are, Robbery with a firearm specification, Case Number CR-01412713, in the Cuyahoga County Common Pleas Court, on or about April 14, 2002; and Trafficking in Drugs, Case Number CR-06-485716, in the Cuyahoga County Common Pleas Court, on or about May 29, 2007, did knowingly possess in and affecting interstate commerce ammunition, to wit: 18 rounds of 9mm and 44 Ultramax 40mm rounds, in violation of Title 18, United States Code, Sections 922(g) (1) and 924(a) (2).

(*Id*.)

On November 4, 2009, Keith filed this motion. (Doc. 47.) On November 10, 2009, the Court held an evidentiary hearing in this matter. (Doc. 51.) On December 2, 2009, the Government filed supplementary briefing (Doc. 52) and on December 3, 2009, Keith did so as well (Doc. 53).

## II.    FACTUAL BACKGROUND[2]

On February 12, 2008 and March 14, 2008 law enforcement officials under the direction of Agent Vito Monteleone of the Cuyahoga County Sherriff's Office and in affiliation with the Northern Ohio Law Enforcement Task Force, conducted controlled purchases of cocaine from Keith. (*Cf.* 11/9/09 Hrg. Tr. at 14:19–14:23 ("Direct Examination of Agent Monteleone") ("Question: What do you mean by the term controlled buy? Answer: The controlled buy . . . the source [was] searched prior to and after the transaction. He [was] outfitted with the transmitter and recorder. The source [was] in, you know,

---

[2] Many of these facts are taken from a brief filed by the Government on February 24, 2009 brief. (Doc. 24.) Keith does not challenge their accuracy (*see* Doc. 47 ("Counsel hereby adopts [the] statement of the facts as outlined by . . . Keith in his pro se motion . . . and by the government in its response.") and they are consistent with the testimony at Keith's November 10, 2009 suppression hearing (*see generally* Doc. 51).

3

constant visual surveillance of the surveillance officers.").)[3] Keith chose the location for those transactions, and suggested that the February 12, 2008 transaction occur at 5842 Cable Road. (*Id*. at 15:23–24.) While Keith asked that the March 14, 2008 transaction take place away from 5842 Cable Road, he was observed leaving that home just prior to the March 14 sale. (Doc. 24 at 3.) Those facts, along with information regarding drug trafficking by Keith that was received from another known and reliable source, caused the Government to believe that Keith used 5842 Cable Road as a place to store and/or sell narcotics. (*Id*. at 2.)

On April 3, 2008, the Government set up surveillance at 5842 Cable Road, intending to conduct another controlled purchase and arrest Keith. (*Id*. at 4.) A confidential source and Keith then began communicating with each other regarding a drug transaction to take place later that day. (*Id*.) Keith, who had been inside the Cable Road residence, entered a vehicle and drove away from the house and entered a business, exiting a short time later. (*Id*.) On his way back to the house, less than 60 minutes after the last communication between Keith and the confidential source and a short time before the scheduled transaction, Agent Monteleone decided to stop the vehicle before Keith returned to the house, believing that Keith was preparing to engage in the planned drug sale. (*Id*. at 4–5; *see also* Direct Examination of Agent Monteleone at 25:5–12 ("[W]e wanted to do a traffic stop on Lorenzo Keith. However, the Cleveland Police officers weren't able to get to him in a timely fashion. By the time they got to him he was almost home. We just went ahead and made a determination to take him down since . . . [h]e [was] almost at the residence of 5842 Cable Road. . . . I wanted to keep the [identity of the] confidential source . . . protected. . . . [but] I wasn't able to do that." (questions omitted)); *cf. id*. at 27:17–21 ("Question: Under what authority did you think that you had ability to make that stop at that time in the fashion you made it? Answer: We had two prior buys off Lorenzo Keith. And we had the

---

[3] Keith does not challenge the veracity of Agent Monteleone's testimony. It bears mentioning, however, that such a challenge would not be well-taken, as this Court finds Agent Monteleone to be a credible witness.

phone call conversations. And we were in the middle of a transaction with him on that day.")). Agent Monteleone radioed a Cleveland Police Cruiser, which stopped Keith's car about 1/3 of a mile from the residence. (Doc. 24 at 5.) Thus, though there appeared to be some question as to the basis for the stop of Keith during briefing, it became clear during the hearing that Keith was not stopped based on a traffic violation; he was stopped and detained because Agent Monteleone believed he had probable cause to arrest Keith because he was in the process of an illegal drug transaction.

The police officers first performed what they describe as a protective pat down on Keith, during which they discovered two vials of a white powdery substance in Keith's pants. (Doc. 24 at 5; Direct Examination of Agent Monteleone at 28:3–5 ("Question: Now, under what authority was [Keith] searched? Answer: It was a pat down, officer safety. It was just a standard routine.")). Keith was placed under arrest, and asked about his illegal drug activity; he then informed the officers that he wanted to cooperate. (Doc. 24 at 5.) Agent Monteleone then arrived at the scene and read Keith his rights again. (Direct Examination of Agent Monteleone at 28:18–19.) The substance found within the vials would later be revealed as "cut," a white powdery substance added to cocaine to give it the appearance of additional volume.[4]

Agent Monteleone then drove Keith to 5842 Cable Road. (*Id*. at 31:1–3.) Once there, Keith explained that he did not live at 5842 Cable Road, pay rent at that residence, nor even have a key. (*Id*. at 32:22–24; 33:23–34:1.) Keith did assert that he lived at another location, and stated that he would freely consent to a search of that location. (*Id*. at 32:20–24.)

Because Agent Monteleone's team wished to search the 5842 Cable Road property, however, they knocked on the door to see who would answer. A woman, Shirley Williams, came to the door and told the agents that she was the leaseholder. (*Id*. at 34:21–35:1.) She also explained that Keith, her

---

[4] It does not appear that "cut" is itself illegal.

5

godson, would sometimes "chill[]" there. (*Id.*) She then consented to a search of her residence. (*Id.* at 35:15–36:3.)

When the agents searched the residence, they found a green jacket sitting on a bed, which Williams stated that Keith had been wearing earlier that day. (*Id.* at 7.) Inside of that jacket, the agents found a baggie filled with a considerable quantity of cocaine. (Doc. 24 at 6–7) Two guns were also located in that bedroom – one underneath the bed and another in a dresser. (*Id.*)

The agents then went outside and again read Keith his rights. (*Id.*) Keith waived those rights, signing a written waiver form. (*Id.*) He then made apparently incriminating statements. (*Id.*) Keith was ultimately released, rather than being immediately charged. (*Id.*)

On September 12, 2008, after having been indicted in this case, Keith was arrested. (*Id.* at 8.) At the time of his arrest, he was in possession of another firearm. (*Id.*)

### III. KEITH'S MOTION TO SUPPRESS

In his motion, Keith asserts six grounds for relief:

- The government did not have reasonable suspicion necessary to support the above traffic stop.

- The officers did not have reasonable suspicion to believe that Keith was dangerous when they frisked him, nor would the vials have been immediately apparent as some type of weapon.

- The officers did not have probable cause to detain Keith after the traffic stop.

- Keith's "consent" to the search of 5842 Cable Road is the fruit of the poisonous tree from the above unlawful detention.

- Williams lacked actual or apparent authority to consent to a search of Keith's jacket, and Keith had an expectation of privacy in his jacket, even though he was not wearing it.[5] The Court construes this objection to extend to the search of the dresser and area underneath the bed as well.

---

[5] Keith proffers this as two separate grounds for relief: whether Williams could consent to a search of Keith's jacket and whether Keith had an expectation of privacy in that jacket. Although Keith is correct that they are conceptually distinct issues, they are closely intertwined and will be discussed together.

6

- Keith's statements to the police during the course of the above search were obtained as a result of the unlawful searches and seizures, therefore, those statements should be suppressed.

Keith challenges "any and all evidence seized as a result of the unlawful search of his person, his vehicle, and his personal property." (Doc. 47 at 1.) In other words, Keith seeks to suppress all evidence seized from 5842 Cable Road: the drugs found in his jacket pocket, the firearm found in a dresser, and the firearm found under a bed. He also seeks to suppress the cut found on his person when officers frisked him and certain unidentified statements that he made during the above search.

### IV. ANALYSIS

The majority of the questions before the Court are not particularly close. In short, the Government was entitled to stop and question Keith regarding his involvement in cocaine distribution at the time of the challenged traffic stop, could reasonably have believed that the vials of cut were ammunition or weapons such as pocket-knives or switchblades, had probable cause to believe that a crime was imminent at the time of Keith's arrest, and received valid consent to search the areas where illegal weapons and drugs apparently belonging to Keith were recovered.[6] Keith's motion to suppress, though well-argued, is not well-taken.

#### A. Whether the Government Had Reasonable Suspicion to Stop Keith

Keith's first contention is that the officers did not have reasonable suspicion that he was engaged in some type of illegal activity at the time they stopped him. He argues that there was nothing unusual about the conduct witnessed by the police on April 3, 2008, and that he was stopped 1/3 of a mile from

---

[6] The issue of consent to search the area where the drugs were recovered, the pockets of a jacket lying on top of the bed, is a much closer call than that of consent to search the areas where weapons were recovered, the area underneath the bed and a dresser drawer. Even if William's consent was not sufficient to authorize a search of those pockets, however, the police had alternate and independently sufficient grounds under which they could still have properly searched those pockets, as they had probable cause to perform such a search once they discovered the illegal weapons.

7

5842 Cable Road, thus preventing Agent Monteleone from properly concluding that he was going to the arranged meeting place.[7]

There is a fundamental problem with this argument, however. Agent Monteleone had the reasonable suspicion that Keith was on his way to a drug sale because Keith previously had engaged in controlled drug buys and, less than an hour prior to the stop, a confidential source had arranged to once more purchase drugs from Keith. (*See* Direct Examination of Agent Monteleone at 24:9–16 ("On his way back [from] the head shop to the residence there was also conversation between the source and Mr. Keith. . . . About the meeting, [Keith said] something to the effect that, [Keith] had stated to the source, something to the effect that he's on his way. . . . It would be shortly." (questions omitted); *see also id*. at 27:17–21 ("We had two prior buys off Lorenzo Keith. And we had the phone call conversations. And we were in the middle of a transaction with him on that day.")); *cf. United States v. Hernandez*, 2007 U.S. Dist. LEXIS 11405 (E.D. Wis. Feb. 15, 2007) (concluding that a traffic stop was reasonable when the police observed the driver enter and exit a house and a confidential informant informed the police that the driver had likely just received a shipment of drugs); *cf. United States v. Bachman*, 136 Fed. Appx. 955, 956–57 (8th Cir. 2005) ("As [the defendant] drove away from a controlled buy, law enforcement stopped his vehicle. . . if reasonable and articulable suspicion existed in any case, this would be it.").

So, too, it is clear that Agent Monteleone had probable cause to obtain an arrest warrant for Keith based solely on the evidence of Keith's two prior drug transactions. *See, e.g., United States v. Hinson*, 585 F.3d 1328, 1334 (10th Cir. 2009) ("The police officers had probable cause to arrest [the Defendant] based on the controlled buy they witnessed a month before his arrest as well as [the

---

[7] As noted, Keith originally argued that the officers who stopped him had no basis upon which to believe he had violated any traffic laws. After the hearing, Keith's supplemental briefing recast his argument to respond to the testimony that Keith's stop was premised on his drug sales and not an alleged traffic violation.

8

informant's] statements to the police that he regularly purchased drugs from [the Defendant]."); *United States v. Wells*, 347 F.3d 280, 288 (8th Cir. 2003) ("[Defendant] concedes that the officers had probable cause to arrest him on the basis of two controlled buys." (citation omitted)).  These two prior controlled buys, then, even if they stood alone, would have themselves clearly supported an investigative stop – it is axiomatic that probable cause to obtain an arrest warrant is also reasonable suspicion to perform an investigative stop.[8]

In sum, there is no question that the police were entitled to stop and question Keith.

### B.  Whether the Government Had Reasonable Suspicion to Frisk Keith

Keith's second contention is that the officers did not have reasonable suspicion to frisk him, nor to conclude that the vials of cut were weapons and remove them from his pants.  This is misguided.  It is well-established that "an officer may frisk a suspect for weapons in order to assure the officer's safety if a reasonable officer under the circumstances would be justified in believing his safety was at risk." *Thompson v. Tennessee*, No. 3:08-CV-251, 2009 U.S. Dist. LEXIS 52108, at *11–12 (E.D. Tenn. June 19, 2009) (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *United States v. Strahan*, 984 F.2d 155, 158 (6th Cir. 1993)).  In cases such as this one "[t]he indisputable nexus between drugs and guns presumptively creates a reasonable suspicion of danger to the officer."  *United States v. Garcia*, 459 F.3d 1059, 1065 (10th Cir. 2006) (quoting *United States v. Sakyi*, 160 F.3d 164, 169 (4th Cir. 1998)); *see also United States v. Frazier*, 249 Fed. Appx. 396, 403 (6th Cir. Tenn. 2007) ("[D]rug dealers are often armed."); *United States v. Powell*, No. 99-5137, 2000 U.S. App. LEXIS 6131, at *14 (6th Cir. Mar. 29, 2000) ("[This] frisk was constitutional because [the] suspect was wanted on narcotics charges and [the] officer could reasonably believe that suspect used a gun to protect his drugs." (citing with approval *United States v. Smart*, 98 F.3d 1379, 1384-85 (D.C. Cir. 1996)); *United States v. White*, No. 93-4049, 1995

---

[8] It is true that the two earlier buys, alone, would not have justified Keith's warrantless arrest absent evidence that Keith was currently engaging or attempting to engage in illegal activity, or exigent circumstances making an immediate arrest necessary.

9

U.S. App. LEXIS 9765, at *10 (6th Cir. Ohio Apr. 26, 1995) ("[It is] common knowledge that individuals involved in buying and selling drugs often carry guns . . . ."); *cf. United States v. Chavis*, 296 F.3d 450, 458 (6th Cir. 2002) ("[D]rugs and guns are frequently connected."). Put simply, even if the Sixth Circuit would not go quite so far as to say that police may <u>always</u> presume that a suspected drug-dealer is armed, a police officer is surely entitled to frisk a drug-dealer for weapons when that drug-dealer is reasonably believed to be on his way to a drug deal.

Of course, the frisk itself must be reasonably limited in scope – officers may only search for weapons, not for other contraband. *See Michigan v. Long*, 463 U.S. 1032, 1052 (1983) (citing *Ybarra v. Illinois*, 444 U.S. 85, 93–94 (1979)); *Club Retro LLC v. Hilton*, 568 F.3d 181, 209 (5th Cir. 2009) ("The search is 'a limited protective search for concealed weapons,' not a search to discover evidence of a crime." (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972))); *United States v. Wilson*, 506 F.3d 488, 492 (6th Cir. 2007) ("[T]he search must be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." (internal quotation marks and citation omitted)). In this case, however, there is no indication that the frisk to ensure officer safety exceeded its permissible scope – the officers here felt unidentified solid objects in Keith's pants. A reasonable officer might suspect that vials were ammunition, a small pocketknife, or a switchblade.[9] The officers simply did not violate Keith's rights when they uncovered the vials of "cut."

### C. Whether the Officers Could Place Keith in Custody

In its brief, the Government describes Keith as having been placed in "investigatory custody" during the above events. (Doc. 24 at 5.) Notwithstanding its use in passing within two older opinions from other circuits, *see United States v. Ceballos*, 812 F.2d 42, 44 (2d Cir. 1987); *United States ex rel. Smith v. New Jersey*, 322 F.2d 810, 815 (3d Cir. 1963), this is a problematic phrase, as it confuses two

---

[9] There is no evidence in the record to indicate that officers in any way manipulated the contents of Keith's clothing. *Cf. United States v. Miles*, 247 F.3d 1009, 1014–15 (9th Cir. 2001) (explaining that police may not manipulate clothing to learn its contents).

distinct legal concepts: "investigatory detention" on one hand and "custody" on the other. *Cf. United States v. Clemons*, 201 F. Supp. 2d 142, 144 (D.D.C. 2002) ("[T]today police officers confront situations more fraught with danger than in the past, including circumstances that sometimes justify – even under the rationale of *Terry* – the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with the concept of 'custody' than with 'brief investigatory detention.'" (citation omitted)).  It is clear, however, that Keith was in custody when Agent Monteleone placed Keith in a police cruiser and drove Keith to a location other than that of the initial stop.  *See United States v. Brito-Melo*, No. 05-10227, 2006 U.S. Dist. LEXIS 62972, at *19 (D. Mass. Sept. 5, 2006) (citing *United States v. Smith*, 3 F.3d 1088, 1098 (7th Cir. 1993)).  The question, then, is whether Agent Monteleone was entitled to arrest Keith at the time that he did this.[10]

The Court is guided by the well-established principle that "'a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed.'"  *United States v. Turner*, 553 F.3d 1337, 1344 (10th Cir. 2009) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)).  The Supreme Court "'repeatedly has explained that 'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'"  *Noy v. Travis*, No. 06-4370, 2009 U.S. App. LEXIS 15819, at *7 (6th Cir. July 13, 2009) (unpublished) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (U.S. 1979)).  This is hardly a bright line rule, but it is not nearly so high a standard as the one for which Keith argues:

> [A]t what point does a body of evidence amassed by a police officer against a particular suspect cross the line from merely raising a suspicion to establishing probable cause?  In many respects, this raises a difficult epistemological problem.  As Descartes famously

---

[10] Even were the Court to determine that Agent Monteleone was <u>not</u> entitled to place Keith into custody, however, it is worth noting that, as explained below, all of the contraband seized by the Government would still be admissible into evidence.

11

> observed, to the skeptic, any proposition – no matter how seemingly certain – carries with it a degree of doubt. But judges are not philosophers. To find probable cause, the law does not require that we rule out every conceivable explanation other than a suspect's illegal conduct. Instead, we need only consider whether there are facts that, given the "factual and practical considerations of everyday life," could lead a reasonable person to believe that an illegal act has occurred or is about to occur. As evidence pointing to a suspect's likely illegal behavior mounts, it will approach a threshold beyond which probable cause exists. While it is difficult to define that threshold with linguistic precision, the traditional legal tool of analogical reasoning generally permits us to determine whether a given set of facts, when compared with prior cases, is sufficient to satisfy the probable cause requirement.

*United States v. Strickland*, 144 F.3d 412, 416 (6th Cir. 1998) (citation and footnotes omitted).

In this case, "the traditional legal tool of analogical reasoning generally permits us to determine whether a given set of facts, when compared with prior cases," yields a clear result. The police arrested Keith only after having strong evidence that Keith had been engaged in two prior drug transactions, discovering vials of a substance used for "cutting" cocaine, and having concrete information that Keith was about to commence another drug transaction. (*See* Direct Examination of Agent Monteleone at 24:9–16 ("On his way back [from] the head shop to the residence there was also conversation between the source and Mr. Keith. . . . About the meeting, [Keith said] something to the effect that, [Keith] had stated to the source, something to the effect that he's on his way. . . . It would be shortly." (questions omitted); *see also id*. at 27:17–21 ("We had two prior buys off Lorenzo Keith. And we had the phone call conversations. And we were in the middle of a transaction with him on that day.")). These facts are strikingly similar to those considered by the Sixth Circuit in *Strickland*. *Cf. Strickland,* 144 F.3d at 417 ("Armed with two taped conversations of known drug dealers who identified [the Defendant] as a potential source of cocaine, an informant's account of a conversation in which [the Defendant] agreed to meet [the informant] at a certain time and place to sell him cocaine, and the independent observation of [the Defendant's] arrival at the Corner Market with associates who did not accompany [the Defendant] into [the informant's] car, the police decided to arrest [the Defendant]. We hold that, on these facts, the officers had probable cause to do so."). That the police placed Keith in custody when they believed that

12

he was traveling to a drug deal, rather than after he arrived at the location of that deal, is not enough to distinguish Keith's case. *See id.,* 144 F.3d at 417 ("[T]here will be marginal cases that will raise difficult issues of factual sufficiency, but this is not such a case."); *see also United States v. Hinson*, 585 F.3d 1328, 1334 (10th Cir. 2009) ("The police officers had probable cause to arrest [the Defendant without a warrant] based on the controlled buy they witnessed a month before his arrest as well as [the informant's] statements to the police that he regularly purchased drugs from [the Defendant].")

Under the facts and circumstances of this case, the police had probable cause to believe that Keith was about to engage in a drug transaction, and to arrest him for it.

### D. Whether Keith's "Consent" to Search Was Effective

Keith's forth argument is that any consent to search 5842 Cable that is attributed to Keith is the result of a wrongful stop and pat-down, and was thus ineffective. Notwithstanding this Court's determination that there was no wrongful stop or pat-down, this argument is moot, because there is no assertion that Keith consented to any search of that residence. (*See* Direct Examination of Agent Monteleone at 32:7–33:14.)

### E. Whether The Police Were Permitted to Search the Dresser, Jacket, and Area Under a Bed at 5842 Cable Road

Keith next argues that Williams did not have the authority to consent to a search of a dresser, jacket, and an area underneath the bed in the guest room of her house. Keith asserts that: (1) he had a subjective expectation of privacy in those areas and his jacket; (2) this expectation was objectively reasonable; and (3) Williams could not consent to a search of those areas and his jacket. *See United States v. Waller*, 426 F.3d 838, 844–45 (6th Cir. 2005); *see also United States v. Brown*, 635 F.2d 1207, 1211 (6th Cir. 1980) ("Two elements must be present to justify the conclusion that [the Defendant] had a legitimate expectation of privacy . . . first, [the Defendant] must have a subjective expectation of

13

privacy; and, second, [the Defendant's] expectation must, as an objective matter, be one that society is prepared to recognize as reasonable."). Keith's arguments here are not persuasive.[11]

On the facts of this case, the critical inquiry is whether Williams had the authority to consent to a search of these areas of her house and to Keith's jacket: she owned the home, owned the furniture in it, <u>decided</u> which individuals were permitted to use both, and maintained both between the uses by various differing visitors.[12] The answer to this question turns on whether Williams had mutual use of those areas and that jacket, such that she had joint access and control over them:

> An exception to the Fourth Amendment's prohibition on warrantless searches applies where officers obtain voluntary consent to search, either from the person whose property is searched . . . or "from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected," *United States v. Matlock*, 415 U.S. 164, 171 (1974). Common authority enables a third party to consent to a search if that third party has "joint access or control for most purposes." 415 U.S. at 171 n.7.

*Johnson v. Weaver*, 248 Fed. Appx. 694, 697 (6th Cir. 2007); *Waller*, 426 F.3d at 845 ("[C]ommon authority rests 'on *mutual use* of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might

---

[11] Keith has no standing to object to the entry into Williams' home and does not dispute that she had the authority to both consent to that entry and to consent generally to a search of her home. His claim is simply that her consent was not effective as to certain areas of or items in the bedroom he was authorized to use while visiting.

[12] It is, as well, something of a close call whether Keith had a subjective expectation of privacy in the bedroom that was objectively reasonable. (*See* 11/9/09 Hrg. Tr. at 78:1–79:5; 86:9–19 ("Direct Examination of Shirley Williams"); *id*. at 91:9–94:7 ("Cross-Examination of Shirley Williams").) On one hand, Keith never used the residence for more than five hours at a time and other individuals regularly accessed the room that Keith used, *see United States v. Berryhill*, 352 F.3d 315, 317 (6th Cir. 2003) ("[A] casual, transient visitor does not have a reasonable expectation of privacy in his host's home."). On the other, he regularly stored some belongings there and primarily seems to have used the room for sexual activity, an inherently private function, *see United States v. Heath*, 259 F.3d 522, 532-533 (6th Cir. 2001) (finding legitimate expectation of privacy by cousin who had his own key and would sleep on the couch once a week for two years). Because Keith did not testify at the suppression hearing, it is difficult for the Court to reach any conclusions whatsoever about his subjective expectations. Nevertheless, the Court assumes, without deciding, that Keith had a subjective expectation of privacy that was objectively reasonable.

permit the common area to be searched.'" (quoting *Matlock*, 415 U.S. at 171 n.7) (emphasis in original); *see also United States v. Burns*, 298 F.3d 523, 542 (6th Cir. 2002). Her testimony conclusively establishes that she did.

As an initial matter, there can be no serious contention that Williams did not enjoy the mutual use of her own dresser:

> Question: And did you from time to time go inside the dressers [where one of the guns was found]?
>
> Answer: Yes, when I put clean linen and towels.
>
> Question: You took care of the room; is that correct?
>
> Answer: Of course.
>
> Question: You would change the sheets, you would put clean clothes in there, and you would also put clean linen in the dressers?
>
> Answer: Right.
>
> Question: So you had full access to go in there any time you wanted, correct?
>
> Answer: Right.

(Direct Examination of Shirley Williams at 78:1–79:5; 86:9–19.) This testimony unambiguously establishes Williams' authority to consent to a search of that dresser. *Cf. Waller*, 426 F.3d at 845 ("A valid consent to search [a] closed container must come from one who has common authority over the effects sought to be inspected, one who has mutual use of the property, and one who generally has joint access or control for most purposes."). Similarly, Williams had authority to allow the officers to look under the bed. *Cf. id.*[13]

---

[13] Williams, as well, surely had apparent authority to consent to such a search:

> Question: What you're aware of with – what you're aware of with respect to, you know, just her giving consent to search ultimately Mr. Keith's property?
>
> Answer: Well, she stated that Mr. Keith does not live there. She stated that from time to time he'll come and chill there. She stated that he didn't have a lease or didn't pay her any rent. She stated that she had full access of the

15

Whether Williams' had the authority to consent to a search of the jacket pockets, on the other hand, is an extremely close call. On one hand, there is a strong argument that the inside of a jacket's pockets are protected to the same extent as a closed container such as a bag or suitcase and that Keith could assert sole control over such a personal item. *See Waller*, 426 F.3d at 846. On the other hand, people have a greater expectation that the pockets of their jackets may be inadvertently disturbed, when, for example, someone moves the jacket. In this case Williams explained that she had access to all clothing lying in the bedroom and was in the habit of regularly laundering the clothes left in the room. In particular, Williams testified that she would sometimes check Keith's pockets:

> Question: Now, did you typically rummage through his belongings when he wasn't present in that room?
>
> Answer: No.
>
> Question: You didn't go through and check and see what was in his pants pocket, or in the duffle bags, or in the jackets?
>
> Answer: No. The only way I checked his pockets is if clothes is on the floor and they was dirty and I washed them.
>
> Question: Is there a laundry area, or are you talking about up in that bedroom?
>
> Answer: No. If the clothes was on the bedroom floor they was dirty.
>
> Question: So they would be scooped up and washed by you?
>
> Answer: Yes.

> entire house; that she had in fact had access to the room that we had searched on that day; that she would clean. She told us that the other – there were two other rooms in the upstairs part of the residence. She stated that those were – I believe one was her son's.

(Cross-Examination of Shirley Williams at 53:21–54:7); *cf. United States v. Morgan*, 435 F.3d 660, 664 (6th Cir. 2006) ("When we inquire into whether there was apparent authority to validate third-party consent to a warrantless search, we look at the facts available to the police at the time the search began."); *Waller*, 426 F.3d at 846 ("[Apparent authority is present] if the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." (citation and internal quotation marks omitted)). This appearance of authority was fostered by Keith himself, moreover, when he denied ownership of or any interest in Williams' house or any of the items in it.

(Cross-Examination of Shirley Williams at 92:17–93:4.) Keith's jacket, of course, was lying on the bed, not on the floor. Nevertheless, that Williams would sometimes "scoop up" Keith's dirty clothing and check his pockets, combined with her full access to the room, appears to establish the requisite joint access and control necessary to consent to a search of those pockets. *Cf. Waller*, 426 F.3d at 845. In sum, then, there is no basis to exclude the cocaine seized from Keith's jacket pockets.[14]

### F.  Whether Keith's Post-Search Statements Should be Suppressed

Because, as concluded above, Keith's constitutional rights were not violated, there is no basis to suppress Keith's post-search statements. Although irrelevant to the disposition of this motion, the Court notes that it is still unclear from the record what Keith is alleged to have said either during or after the search.

### V.  Conclusion

For the aforementioned reasons, Defendant Lorenzo Keith's Motion to Suppress Evidence (Doc. 47) is **DENIED**.

---

[14] Even if Williams did not have this actual authority to consent to a search of Keith's jacket pockets, the evidence discovered therein would still be admissible. As previously discussed, no reasonable jurist could debate that Williams could properly consent to a search of the dresser in which an illegal firearm was found. Once this firearm was discovered, the officers then had probable cause to conduct a further search of any of Keith's belongings to ensure that no other weapons were present.

It is unclear from the record whether the jacket was searched prior to the dresser. Still, even assuming that the jacket was searched first, because the search of the dresser was not predicated on the discovery of cocaine in the jacket, the cocaine would then be admissible under the doctrine of inevitable discovery. *See Murray v. United States*, 487 U.S. 533, 541 (1988) ("Invoking the exclusionary rule would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one." (citing *Nix v. Williams*, 467 U.S. 431, 443 (1984)); *United States v. Alexander*, 540 F.3d 494, 502 (6th Cir. 2008) ("The inevitable discovery doctrine 'requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred.'" (quoting *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995))).

**IT IS SO ORDERED.**

<u>s/Kathleen M. O'Malley</u>
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: January 6, 2010**